Good afternoon. We're ready to hear argument in the case of United States v. Madigan. Miss Zaharia. Good afternoon and may it please the court. Amy Zaharia of Williams and Connolly Michael Madigan. In my limited time, I'd like to focus on three reasons why the court should reverse or vacate, although of course I'm happy to address any issues. First, as to the comment counts, the alleged quo, an alleged promise to take unidentified future action on unidentified future legislation is far too vague to satisfy McDonald's requirement that an official promise to take action on a specific question or matter requiring acquittal or at a minimum a new trial in light of instructional error. Second, as to the comment counts under section 666, the intent instructions incorrectly put the focus on the bribe givers intent and incorrectly defined the term corruptly. And third, as to the state board counts, which rest on conversations that materialized into official action, the government failed to prove a quid pro quo, a promise to take an official act or a misrepresentation. If I may, I will start with the first point that I made, which relates to the specificity of the question or matter that the government needed to prove. The parties in this case agreed to define the quo for purposes of the comment counts and section 666 in particular by reference to the standards set forth by the Supreme Court and McDonald. And that has implications both for what the government needed to prove to satisfy rule 29 and what it, uh, and implications for the stream of benefits instruction that the district court added to the instructions. The government did not prove a promise to act on a specific question or matter. The argument the government made below was that speaker Madigan, uh, knew that these benefits were being showered on him in exchange for his official action on future legislation. That's at a 400 and future unidentified legislation is not a specific question or matter. Um, the requirement that an official promise to act on specific is critical in bribery cases because that is what distinguishes ingratiation, lawful ingratiation from unlawful bribery. It is what distinguishes lawful gratuities in the wake of the Supreme Court's decision in Snyder from unlawful bribery. And this case in particular illustrates why it is so important. When you started your, your comments on this, on this and it sounds to me like you're, you're, well, I think you're arguing it both ways. You're arguing it on the sufficiency of evidence. Yes, Your Honor. As an instructional matter, if you focus on that in the first, where's the instructional error at? Sure. The instructional error is the stream of benefits sentence that the, uh, that the district court inserted into instruction 56. And that language to be clear is the term thing of value may involve a stream of benefits and they this for that exchange for one or more official actions. That sentence put a thumb on the scale and favor of the government's argument that the jury could convict based on this ongoing nine year, uh, you know, uh, alleged scheme based on official acts on legislation that were never identified at the time that Speaker Madigan received the supposed benefits. We submit that sentence fails to convey the McDonald requirement for the same reason that the sentence, uh, that, uh, in silver that the second circuit looked at, um, the second circuit in that case held that a, an instruction that allows a jury to convict based on future actions that are not tied to a specific question or matter fails to convey the requirements of McDonald. Counsel, we're supposed to look at instructions as a whole. So what do you say to the argument that adding in the expectations of some future benefit are not sufficient by themselves to make a payment a bribe? Why isn't that enough to have cleared things up for the jury as to what was required? Because nothing in that sentence conveys the requirement that Speaker Madigan needed to have agreed to a again to a specific question or matter. And we submit that legislation writ large is just not such a specific question or matter. Uh, it's critical in this case that the jury have understood that requirement and it's critical that the government have proved such a promise. Uh, the actions that, uh, Speaker Madigan took in this case, of course, were actions that, uh, he would have taken in his role as speaker. He was a speaker of the of the house. Of course, he acted on legislation of interest to combat and the alleged benefits in this case are far outside the typical mine run bribery case. Speaker Madigan did not take cash from combat. He did not take Rolex watches trips to Vegas, all the things you typically see in bribery cases. The alleged benefit is that political allies of his were hired by comment and making those kinds of job recommendations are things that politicians, but these weren't just job recommendations. You do acknowledge that, correct? We do acknowledge that, but the government's arguments don't turn on the nature of the jobs at all. The government alleges that as Speaker Madigan referring the Reyes Carson law firm for real work that it performed and recommending interns for real internships that they showed up to that those themselves are bribes. And so nothing about the fact that five of the contractors we admit did little to no work matters for purposes of the question that we're discussing now, which is what does Speaker Madigan need to promise at the time all the way back in 2011 that the government alleges he entered this bribery agreement? It's not even clear exactly what the government thinks he agreed to in 2011. They don't claim that he alleged that he would vote in favor of comment on every piece of legislation. That's not their argument. And in fact, he didn't vote in comments fever. They don't claim that he agreed, but it's not just votes, right? It's the ability to move legislation forward. He was the speaker, of course, but they don't allege that he agreed to take every action that comment asked him to take. And he didn't do that either. There's lots of evidence throughout this record of Speaker Madigan taking actions contrary to comments interest during this period. And that's why, again, it's so critical that the government have proved a particular promise to do something specific. But when you look at Instruction 47, which is the definition of official action, it was given in keeping with Judge Maldonado's comments, you read it in the context of the instruction of the whole. The jury is instructed that the question or matter must be something specific and focused rather than a broad policy objective. So it sure seems to me that it tracks McDonald in that regard, at least as an instructional matter. We agree and we have not objected to Instruction 47 on its own. The problem is that Instruction 56 then told the jury that it could convict on this idea that Speaker Madigan received extrema benefits over time in exchange for one or more official actions, which necessarily means in the future. And it failed to tell the jury that at the time he received the ad issue benefit, he needed to understand that it was an exchange for action on a specific question. 56 itself says that the government needs to prove that the defendant understood that the conspiracy involved in this for that exchange of a thing of a thing of value for an official action as defined in Instruction 47. Correct. But then it went on to add, it went on to say that a thing of value may include a stream of benefits, i.e. a stream of benefits, excuse me, over time. That is what the government argued to the jury that over nine years Speaker Madigan received the stream of benefits and the form of jobs and that it was an exchange for just legislation as a whole. And I think it's quite telling that the government cannot point the court to any case that has affirmed that sort of a bribery theory. The only case that they point to is the First Circuit's decision in Woodward, which involved this fairly rare petition for a writ of Coram Novus. But tellingly, if you look back at the underlying decision in that case, which is cited in Woodward, it was pursued on a gratuity theory. The argument in that case was that over a five-year period, there were benefits given on a public official in connection with legislation, but that was a gratuity theory. The government has no case where a court has endorsed the idea that in one point in time, here in 2011, an official could accept a thing of value in exchange for unidentified future action on unidentified legislation occurring many, many years in advance. Okay, I mean, I have a feeling your adversary is going to say, it's unidentified in this sense. It's definitely unidentified in the sense that we can't look into the future and name the House bill or give it its number or anything like that. But the evidence before the jury permitted a finding that it was specific as to helping ComEd get out from under its rate, the rate difficulties that it was having, both with the legislature and with the ICC. And it doesn't have to be as specific as you're suggesting. What's your response to that? A couple of responses. First, rate legislation is not the kind of thing in McDonald's terms that can be put on an agenda, tracked for completion, and checked off as complete. Why not? Because it takes so many different forms. And this case is quite a good example of that, which is in 2016, what ComEd was asking for in the course of negotiating the FEJA legislation is it wanted a completely different kind of rate. It wanted what are called demand-based rates, and it was pushing for a new kind of rate. There's no evidence in the record that in 2011, the parties had that in their mind. And in fact, in 2016, Speaker Madigan and his staff opposed these forms of new rates that ComEd wanted. Something else ComEd was pushing for in 2016 was the ability to build what are called microgrids, which has nothing to do with rates whatsoever. That is an ability for ComEd to actually generate electricity. So the legislative agenda that the government pointed to in the proceedings below is far more expansive than just setting rates. And again, the idea that in 2011, there could have been an agreement that Speaker Madigan would take action with respect to legislation five or eight years later, that there's no evidence anyone was contemplating at the time in 2011, we submit is not specific enough. Now, unless the court wishes to address that further, let me address the issues with respect to the intent instructions. And I'd like to particularly focus on the fact that the intent instructions in this case focused on the intent of the bribe giver. And I would point in particular, this occurs in two places. It occurs in Instruction 56, in the definition of corruptly, but it's particularly stark in Instruction 58, which is called intent to influence. And in Instruction 58, the court instructed the jury, it is sufficient if the public official knew that the thing of value was offered with the intent to exchange the thing of value for the performance of the official act, meaning it is telling the jury it is sufficient if the official understand the counterparty's intent. And that is just not a correct statement of Section 666. Section 666, unlike Section 201, requires that the official intend to be influenced or rewarded. This Instruction 58, which was a proposal from the government, came from this court's pattern instructions on honest services fraud, not Section 666. We objected to it at R-314 on the ground that this is not a Section 666 instruction. And in telling the jury that it is sufficient that the official understand the counterparty's intent without requiring the statutory language that the official intend to be influenced or rewarded, that instruction, together with the corruptly instruction, misstated the relevant intent. Did you object that that—the way I read your objection to that is that it came from the wire fraud instruction, but that in and of itself doesn't make it problematic in light of honest service fraud. What the defense then did was it offered a proposed edit to—during Instruction 58. You know what I'm talking about on that? And it was accepted. In other words, is the position on appeal that 58 was just wholesale objected to? I don't think in R-314 we objected to it wholesale, but we consistently took the position. We also objected in R-314 to the language of the corruptly instruction, and we objected in R-314 that that sentence incorrectly put the focus on the intent of the bribe giver. So that's also in R-314. And then, of course, in our Rule 33 motion, we raised this issue expressly. The district court passed on it. The government did not claim this had been waived. The district court did not claim it had been waived. And so at a passing on this issue on the merits at the Rule 33 stage preserves it. But we do think in R-314 we objected both to Instruction 58, but we also objected on this precise basis to the definition of corruptly in Instruction 56. Am I reading you right—your brief right—to say you are challenging Instruction 58 on a different ground as well, and that is that the way that it's worded, it relieved the government of the obligation to prove the separate freestanding element of intent to be influenced? Yes, exactly. Is that right? Yes, exactly, Your Honor. And that is the same argument that we made at the Rule 33 stage, that the official needs to have the intent. It's not enough that the official knows the intent of the bribe giver. I see I'm almost in my comment counts, but I can either save that for rebuttal or even to my rebuttal time. Okay, thank you. Thank you, counsel. May it please the Court, Julia Schwartz on behalf of the United States. The properly instructed jury had abundant evidence to find that former Illinois House Speaker Michael Madigan engaged in quid pro quo bribery. The instructions, considered as a whole, ensured that the jury found that Madigan engaged in and intended this for that exchange rather than mere job recommendations, legal lobbying, or run-of-the-mill political horse trading. With regard to ComEd, the evidence, considered in the light most favorable to the government, proved a continuing scheme that involved specific legislative acts over a period of years. And the specificity did start at the beginning in 2011. In part, that was because Madigan in 2011 imposed what's called the sunset on this new formula rate legislation that ComEd so desperately sought that year. And as a result of that sunset, ComEd, he knew ComEd would have to go back to the legislature over and over to get extensions, which ComEd did in 2014 and 2016 and again in 2019. So that was a specific focused object of the bribery conspiracy from the very beginning before any official action took place. Of course, there were other actions beneficial to ComEd that ComEd sought and in many instances Madigan indeed acted upon. But there was a through line throughout the conspiracy, which is legislation that affected the way ComEd charged its customers and affected its bottom line. And as Judge Scudder, you alluded to, ComEd was in dire financial straits leading up to the passage of the EMA or formula rate legislation in 2011. And so this was much needed legislation. And the timing, the beginning of those payments, first to Frank Alivo, a no-show Madigan subcontractor in August 2011, and then the contract with Reyes-Curson just one day before the final vote on that formula rate legislation, showed that from the outset, these were linked. How would you describe what the focused and concrete matter was that in your evidence showed he agreed to ex ante? Your Honor, the specific and focused matter that the conspiracy focused on in 2011 was Madigan's support on ComEd legislation and specifically legislation affecting ComEd's rates and its bottom line. So all of the types of legislative acts that ComEd sought over the years that followed easily fall under that umbrella. And why, in your view, in response to what you heard from the other side, why is that not proceeding at too high of a level of generality legally? McDonald held that an official action has to be something concrete and focused, has to be something that is a formal exercise of government power that can be put on agenda. Acts involving legislation, official action a speaker of a state house takes to move legislation, to get it on the kind of in the heartland of official actions McDonald contemplated. A far cry from hosting meetings, setting up phone calls, and the like, which the McDonald court was specifically concerned with. So in that regard, this case, in our view, does fall in the heartland of a stream of benefits quid pro quo bribery scheme. I'd also note that the scheme wasn't just a one and done type of setup. Madigan was actively involved in adding new subcontractors, approving the termination of other subcontractors, approving their movement from one intermediary to another over the eight plus years of this conspiracy. So it was an ongoing agreement to have both the quids and the quos. And so in that sense, it was specific and it was ongoing throughout the entire period. I want to focus on the instructions too, and some of your honors questions. With regard to specificity, the instructions as a whole did require the jury to find that before any official action took place, there was agreement or an understanding on a specific official action. That's at a 505, 515, 516. There were even more guardrails put into place by the district court including the instruction that vague expectations are not sufficient to find bribery. And in addition, that an official action can't include a broad policy objective. So between the requirement of a specific this for that exchange that precedes official action and the other instructions, there was simply no way that this jury could have convicted of lawful innocent conduct. In addition, there were instructions that said legal lobbying alone is not a crime, that job recommendations alone are not crimes. So the district court, in short, placed guardrails in the jury instructions that ensured that this verdict was not based on impermissible factors. Can I ask you a question about the instructions? Sure. So if you focus on instruction 58 specifically, so it's at 509 of the appendix, why isn't Mr. Madigan correct that that instruction either does or risks conflation of two distinct elements in 666? The distinct elements are intent to influence and intent to be influenced. At least under our case law, those are not the same exact thing at all. And when you read that instruction, why isn't there some confusion on that point? And the reason I say that is because it looks like in the second sentence to me, nor is it necessary. It looks like the second sentence is focused on the public official's intent. Whereas in our case law, the intent to influence is more of an inquiry of the defendant's knowledge, understanding, belief as to what the bribe giver is intending. You see what I'm asking you? I think so, Your Honor. That instruction is wholly consistent with the Supreme Court's decision in Snyder, where Snyder said it does not matter under 666 if a public official takes a bribe and doesn't intend to change his official action one way or another. That's clear in Snyder. It was confirmed by this court in the recent Quay decision. And Snyder in addressing that emphasized that that's sort of the work that the word reward in the statutory phrase is doing, the phrase influence and reward. So the purpose of this instruction and that portion of the Snyder opinion is to allow for a conviction in an instance where, say, in a hypothetical, a police officer solicits a bribe from a motorist who has a ticket, say, and then gets the payment and says, oh, well, I would have not given the ticket anyway. That bribe didn't affect what I did. That portion of Snyder and this instruction, which is wholly consistent, guards against that. That is still bribery because it involves an understanding that there was an intended exchange. So that is an instruction that's wholly consistent with the law in the circuit and in the Supreme Court. Do you agree the government had to prove beyond a reasonable doubt that he intended to be influenced? The government had to prove that he had to be intended to be influenced or rewarded. Again, rewarded, I think, is doing quite a bit of work there. As the court in Snyder noted. I would, however, note, Your Honor, that the jury instructions did require a finding that Madigan acted with intent to be influenced or rewarded tracking the statutory language. That's at A, appendix 503 and 515. Yeah, in the elements. In the elements instructions. And in addition, at 509, the instructions required a finding that Madigan knew the thing of value was offered with the intent to exchange the thing of value for an official act. So again, taken as a whole, the jury instructions clearly required a finding of an intended exchange of official action for a thing of value. Turning specifically to the corruptly instruction, Your Honor, that has been addressed very recently by this court in Quay upholding the identical, virtually identical instruction given in another 666 case. That opinion is, as I mentioned, consistent with Snyder and should be applied in this case. I'll turn now unless the court has any additional questions to the state board conduct. Those were all honest services, wire fraud convictions. There was abundant evidence for the properly instructed jury to find that Madigan did indeed participate in a scheme to exchange his official action by recommending Alderman Daniel Solis to the governor for a state board position in exchange for private business for himself and for his son. That scheme, that plan, did involve materially false or fraudulent representations. As the evidence showed, the multiple recordings, Madigan planned to falsely represent to the governor that he would be recommending Solis based on his credentials, when in fact that recommendation was based on a bribe. And occasions. And for that reason, Solis would not have been qualified for this job. Madigan's own words and actions were evidence of a scheme to make material misrepresentations and to exchange official action for private benefit. In numerous recordings, Madigan directly connected that state board recommendation with Solis getting him law firm business. So there's just a few examples in government exhibit 197. Immediately after Solis says that the old post office developer would be bringing Madigan business, Madigan thanked him and immediately turned to the state board and how he would go about helping to get Solis appointed to a state board. Similarly, in government exhibit 236, Solis told Madigan he was committed to continuing to introduce him to real estate developers. And Madigan immediately turned to the conversation surrounding the state board again. There are numerous conversations where that link is spelled out, not to mention the prior exchanges between Madigan and Solis on six separate recordings where Solis made clear he was intending a quid pro quo exchange. One of the recordings used that exact phrase. What do you do with the recording? I think it was one of the early ones where the speaker says don't, don't worry about it. In response to Solis saying I'm going to send you business or something to that effect. Your honor, that recording should be viewed as a whole. That comment was sort of dead in the middle where they continue afterwards to discuss, I believe it was government exhibit 151 you're referring to. At one point, Madigan does say don't worry about it, just leave it in my hands. But then at the end of that recording and another recording says there's one more thing you cannot do. You can help my son get connected to a non-profit for insurance work. And then in many recordings that followed, he's again asking for favors of Solis to connect him to the old post office developer to help set up pitch meetings. He's following up with Solis. He's calling Solis to nudge him along in terms of the pitch meetings. So that one phrase, don't worry about it, is in the midst of numerous conversations where Madigan is continuing to press for business all while offering to help push the recommendation to the incoming governor. So a properly instructed jury, again there's no issue with the instructions that has been raised here, had ample basis to find Madigan guilty of honest I have a history question on this that I've had a hard time tracking down. I completely follow what you're saying in terms of the evidence of the recordings of the conversations and even a lot of the documented evidence like the post-it note and the note to which the resumes are attached, all that. But there's a portion of your brief, and this is not trivia, you say on page 55, Madigan also sent Solis board materials. And I think the suggestion perhaps in another place is, if I'm not mistaken, that maybe send him a list of board positions or something. Where is that in the record? Or what do you remember about that? I can't find that. This was part, I don't have the exact exhibits off the top of my head, but this was in Solis's testimony where he testified that Madigan arranged for someone to drop them off at his office, I believe. And it was a series of listing of state boards, their compensation, their makeup, and a brief summary. I may have misread it. So the point, it's not that it's documentary evidence that's in the trial record, it's testimony about documents received. And the documents are also in the record. So Mr. Solis testified about receiving this package from Mr. Madigan, and then also we had in the record copies of what was tendered to Mr. Solis, which he then provided to the FBI. Okay, so would that be introduced into evidence during his testimony? Yes. And I can supplement the record with the exact exhibit after this. So the point of that, Your Honor, of course, was to show that Madigan was taking active steps during this whole process, having a messenger deliver board positions to Solis, then having follow-up phone calls with Solis where he was jotting down the names of the boards, the most lucrative boards with the highest salaries. He was then following up on phone calls to confirm it was Labor Relations and Commerce Commission. So those showed that he was really pressing this along in addition to the fact that Madigan said, I'm going to go to the governor, this will tell him this is what we will do. So all of that supports the scheme to defraud. If there are no further questions, Your Honor, we would ask that this court affirm Madigan's convictions. Mr. Madigan corrupted state government at the highest levels by repeatedly agreeing to trade official action for things of values. This is quintessential bribery, made all the more serious by the extent of time and the critical legislation that it impacted, and for that reason, Madigan's convictions should be affirmed. Thank you. Ms. Zaharia, anything further? Yes, Your Honor. First, legislation affecting ComEd's bottom line is not a specific question or matter. The government pointed the court to the events of 2011. There is no evidence that in 2011, Speaker Madigan understood that when ComEd hired Mr. Olivo, he was agreeing to take any action with respect to any future rate-setting legislation. And the chronology of 2011, I think, shows why it is so important that there be such a promise, because Mr. Olivo was hired in August 2011 after the legislature had already passed EMA with Mr. Madigan's support. That happened in May of 2011. May 2011, the General Assembly passes legislation. August, Mr. Olivo is hired. September, the governor vetoes the bill, and ultimately, the General Assembly overrides the next month. I know you wanted to focus on the beginning of that timeline for that legislation in May, but that legislation doesn't become law until the veto is overridden in October. One of the challenges that your client has is it's not just the Olivo, it's also that law firm, that Reyes-Curson law firm, is retained in what, a day before? Correct, Your Honor, although the negotiations were happening over quite a long period of time in 2011. But the problem is, how are we supposed to know whether those hirings were a gratuity for Mr. Madigan's hard work passing EMA in the first place, or whether they were a bribe for some future action without proof that in 2011, Mr. Madigan understood and promised to act on a specific question or matter. And that is why that requirement is so important. It distinguishes gratuities from bribes. As I explained earlier, it distinguishes ingratiation from bribes. With respect to Instruction 58, nothing in Snyder holds that the government does not need to prove an intent to be influenced or rewarded. We acknowledge the requirement is to be influenced or rewarded, but there very well will be situations where an official does not intend to be influenced or rewarded, even if he potentially knows the counterparty's intent. Consider a situation where someone takes a campaign contribution and perhaps thinks that his counterparty is wanting him to take some action in the future in exchange for that campaign contribution, but he has no intention of taking that action. He's just taking in his campaign contributions. That official would not intend to be influenced or rewarded, and we submit Mr. Madigan, if a jury had been correctly instructed, the jury could have found that Mr. Madigan did not have the intent to be influenced or rewarded when he recommended his allies for jobs at ComEd. Just very briefly on the state board counts, there is no evidence in those recordings showing that Mr. Madigan understood that the favors they were discussing, the kinds of favors that politicians and attorneys who need to generate business ask for all the time, that they were in exchange for each other. All the government has is that they occurred in the same conversation. Well, of course they occurred in the same conversation because Mr. Solis was a government cooperator who was instructed to juxtapose those two things in the same conversations. There is nothing showing that Mr. Madigan understood them to be linked, nor is there anything showing that Mr. Madigan understood he was promising to advise the governor with respect to an official act, knowing or intending that that would be the basis for the governor's action, which is the of McDonald. Unless the court has further questions, we urge the court to vacate or reverse. Case is taken under advisement and the court will be in recess.